UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

MYKAEL LEE BOOKER,

          Defendant.
_____/

Case No. 1:20-cr-189

Hon. Robert J. Jonker
Chief United States District Judge

## UNITED STATES MEMORANDUM REGARDING 924(C)

Defendant and his coconspirators were caught, through an extensive investigation, trafficking cocaine in the Kent County area. Defendant was scheduled to plead guilty on July 7, 2021, at which time the Court had concerns about the propriety of the 924(c) charge in light of the fact that the investigators did not recover Defendant's guns. The United States submits this memorandum summarizing the applicable law and the proofs that it would present at trial on this charge.

### Anticipated Testimony

In October 2020, during the course of a Title III wiretap, investigators intercepted calls in which Defendant and Dennis Cartwright negotiated and agreed to purchase cocaine from codefendant Eiland Johnson. On October 12, 2020, Defendant drove to Detroit to get the cocaine from Johnson and provide a partial payment. Defendant documented this trip with a selfie on his phone:



In the ensuing month, Johnson followed up with Cartwright and Booker regarding further payment. On October 20, 2020, investigators intercepted a call in which Defendant told Cartwright that he was "takin' him the cheese I got for the shit." Defendant drove to Cartwright's house and then to Detroit to pay Johnson. Again, Defendant commemorated the trip with a selfie video:

 

The video not only documented the money that he brought to Johnson, but the pistol (in the red circle above) that he brought with him.

In November 2020, investigators learned that Defendant used an apartment on Wingate Drive Southeast in Kentwood, Michigan. For example, while surveillance officers confirmed he was in the apartment, investigators intercepted a call in which Defendant said that he was about to "cook" a "zip."

On November 22, 2020, Defendant set out to kill someone who owed him a drug debt. In an intercepted call, he said, "He fucked his money up . . . [He] owe me. Beating him ain't [unintelligible] . . . [He] still walking around." Later in the call, Defendant said, "I called [him] twice for a week straight. He told me, 'I'll bring it . . . Why else would I get the shells." To prevent Defendant from following through on his plan, investigators found and trailed Defendant's car. Defendant called his mother and told her that police were following him. He returned to the Wingate apartment and went inside.

Investigators surrounded the apartment while they obtained a federal search warrant. During that time, Defendant made several calls to get rid of contraband in the apartment. He initially told his mother, "I'm not giving up my guns. I need them." He told another woman, "I got the gun, the shells. I didn't do nothing yet." He also made plans for a woman to come to the apartment and remove the guns. She told him, "Give it to Aliyah and I'll be waiting for her on the other side." Investigators saw this woman arrive at the complex, go inside, and leave shortly thereafter. The woman removed multiple guns from Defendant's stash apartment and took them to

a third-party's home at Defendant's direction.

Once investigators obtained the search warrant, they entered Defendant's stash apartment and found him and a woman named Aliyah inside. They found the following in the studio apartment:

- approximately 3.248 kilograms of cocaine in a closet near the bed
- hand press in a black box in the main room
- two digital scales in a blue tote in the main room
- 7.6 grams of crack on the kitchen table
- empty kilogram wrapper in a brown bag in the main room

Investigators also found a Beretta PX4 Storm pistol box containing eight rounds of Winchester .45 caliber ammunition. Investigators arrested Defendant and found approximately 1.2 grams of heroin in his buttocks.

That Defendant had several firearms in his possession is corroborated by numerous videos in his phone from around that time, showing him in possession of several guns:

| October 29, 2020 | |
|---|---|

| October 28, 2020 |  |
|---|---|
| October 26, 2020 |  |



| July 22, 2020 |  |
|---|---|

A firearms expert would testify that these are real guns. Defendant's face, car, and apartment are visible in several of these videos. The gun shown on October 28, 2020, and July 26, 2020, appears to be the same gun that he took to Detroit on October 20, 2020, when he paid Johnson for cocaine.

### Relevant Law

As used in 18 U.S.C. § 924, a firearm is defined as:

(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

In a prosecution for a violation of 18 U.S.C. § 924(c)(1), "the government [is] not obliged to produce an actual firearm as evidence at trial." *United States v. Patino*, 962 F.2d 263, 265 (2d Cir. 1992) (It was sufficient for a kidnapping victim to have

seen only the gun's handle and its form through the defendant's shirt), *cert. denied,* 506 U.S. 927, 113 S.Ct. 354, 121 L.Ed.2d 268 (1992); see also *United States v. Buggs,* 904 F.2d 1070, 1076) (7th Cir. 1990) ("The fact that the gun was not produced at trial or that the witnesses did not have an opportunity to examine closely the weapon does not prevent conviction of a firearm offense."); *United States v. Harris,* 792 F.2d 866, 868 (9th Cir.1986); *United States v. Gregg,* 803 F.2d 568, 571 (10th Cir.1986); *United States v. Parker*, 801 F.2d 1382 (D.C. Cir. 1986). When "a gun is not recovered, eyewitness testimony may be sufficient for the government to meet its burden of proof . . . so long as it provides a rational basis for the jury to find that the object observed by eyewitnesses 'was, in fact, a firearm.'" *United States v. Jones*, 16 F.3d 487, 490 (2d Cir. 1994).[1] The Sixth Circuit has cited this rationale in reaching the same conclusion. See, *e.g., United States v. Woosley*, No. 94-6137, 57 F.3d 1072 (Table), 1995 WL 358268 at *2 (6th Cir. 1995); *Whitis v. United States*, No. 94-6333, 62 F.3d 1418 (Table), 1995 WL 462423 at *4 (6th Cir. 1995). "No specific type of testimony is required." *Jones*, 16 F.3d at 490. "The mere possibility that the object seen by witnesses may have been a sophisticated toy or other facsimile does not necessarily create a reasonable doubt nor is the government required to disprove that theoretical possibility." *Id.*

Gun operability is neither an element of § 924(c) nor a component of the statutory definition of a "firearm." "[A] firearm need not be operable to satisfy the

---

[1] In *Jones*, the superseding indictment only described the firearm that the defendant used in the bank robbery as an "automatic pistol." *Jones*, 16 F.3d at 489.

8

definition of firearm for purposes of 18 U.S.C. § 924(c)." *United States v. Bandy*, 239 F.3d 802, 805 (6th Cir. 2001); see also *United States v. Mack*, 258 F.3d 548, 552 (6th Cir. 2001); *United States v. Yannott*, 42 F.3d 999, 1006 (6th Cir. 1994).

In *Jones*, three employees testified that the defendant had a silver gun with a white handle while robbing their bank. 16 F.3d at 490. Investigators did not recover the gun. *Id.* The defendant was charged with using a firearm during a crime of violence, in violation of 18 U.S.C. §924(c)(1). On appeal, the defendant argued that there was insufficient evidence, based only on witness testimony, that he possessed a "firearm," as statutorily defined. "[T]he eyewitnesses in the bank were not familiar with weapons. And they did not observe the gun at close range." *Id.* at 491. Nevertheless, the witness testimony was "sufficient to permit a reasonable jury to infer that the object displayed by Jones in the bank was in fact a 'firearm.'" *Id.* at 491. The defendant argued that the government did not "offer[ ] evidence that the gun was a working firearm rather than a toy gun or replica weapon." The Court rejected this argument – "Nothing in the statute requires such negative evidence."

In *Woosley,* a witness testified that the defendant "kept poking her in the side with a gun and that Woosley told her he was going to shoot her." 1995 WL 358268 at *2. "[A]s she made her escape from the car she put her hand on the barrel of the gun and it felt like metal." The Sixth Circuit affirmed the defendant's conviction, finding that "this evidence constitutes sufficient evidence to support the finding that Woosley possessed a firearm at the time the crime of violence occurred." *Id.*

The evidence that Defendant possessed a "firearm" in furtherance of a drug

trafficking crime far surpasses these cases. Through the extraction of his cell phone, the United States would present pictures of guns that Defendant possessed and carried during the course of the drug trafficking conspiracy and around the date of the charged offense. That would be corroborated by the evidence found in his apartment – a gun box and ammunition. Further, one or more eyewitnesses would describe seeing multiple guns in his possession on the day of the charged offense. United States would present multiple telephone interceptions in which Defendant, in the best possible position to know what he was in the possession of, admitted to having a gun – "I got the gun."

"[He] owe me. Beating him ain't [unintelligible] . . . [He] still walking around." In this context, it is clear that Defendant did not have a toy or a prop. He had a firearm because he intended to shoot someone over a drug debt.

                                  Respectfully submitted,

                                  ANDREW BYERLY BIRGE
                                United States Attorney

Dated: July 8, 2021                    /s/ Jonathan Roth
                                JONATHAN ROTH
                                Assistant United States Attorney
                                P.O. Box 208
                                Grand Rapids, MI  49501-0208
                                (616) 456-2404